# In the United States Court of Appeals for the Fifth Circuit

JAMES E. SANDERS,
Plaintiff – Appellee,

v.

KRISTEN GIBSON; BRYAN D. REITSMA; ANGELA N. DAVIS; TINA S. VITOLO; MARISSA BARTHOLET,
Defendants – Appellants

On Appeal from the United States District Court for the Northern District of Texas, Wichita Falls Division, U.S.D.C. No 7:23-CV-9

## BRIEF FOR DEFENDANTS-APPELLANTS

*(Counsel Listed on Inside Cover)*

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney
General

**JAMES LLOYD**
Deputy Attorney General for Civil
Litigation

**SHANNA E. MOLINARE**
Assistant Attorney General
Chief, Law Enforcement Defense
Division

**BENJAMIN L. DOWER**
Special Litigation Counsel
benjamin.dower@oag.texas.gov

Office of the Attorney General
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2080 / Fax (512) 370-9814

**ATTORNEYS FOR DEFENDANTS-
APPELLANTS KRISTEN GIBSON
BRYAN D. REITSMA, ANGELA N.
DAVIS, TINA S. VITOLO, and MARISSA
BARTHOLET**

## CERTIFICATE OF INTERESTED PERSONS

Appellant certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

- James E. Sanders, Plaintiff-Appellee

- Sam Weiss, Plaintiff-Appellee's Counsel

- Kristen Gibson, Defendant-Appellant

- Bryan D. Reitsma, Defendant-Appellant

- Angela N. Davis, Defendant-Appellant

- Tina S. Vitolo, Defendant-Appellant

- Marissa Bartholet, Defendant-Appellant

- Benjamin L. Dower, Defendants-Appellants' Counsel

- Texas Department of Criminal Justice (Defendants-Appellants' present or former employer)

/s/ *Benjamin L. Dower*
**BENJAMIN L. DOWER**
*Counsel of Record*

## Statement Regarding Oral Argument

Defendants-Appellants request oral argument and suggests that oral argument would aid the Court's decisional process

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................... iii

Statement Regarding Oral Argument ........................................................ iv

Table of Contents ..................................................................................... v

Table of Authorities ................................................................................ vii

Jurisdictional Statement ........................................................................... 1

    I.    Collateral Order Doctrine ............................................................ 1

    II.   Pendent Appellate Jurisdiction ................................................... 1

Issues Presented ........................................................................................ 3

Statement of the Case ............................................................................... 4

    I.    Relevant Procedural History ........................................................ 4

    II.   Allegations and Exhibits Regarding Due Process......................... 7

        A.   Prison Officials' Positions ..................................................... 7

        B.   The Process Sanders Has Received........................................ 7

        C.   Sanders' Experience in Administrative Segregation ............. 14

Summary of the Argument........................................................................15

Standard of Review ..................................................................................17

Argument .................................................................................................. 18

    I.    Sanders' procedural due process rights have not been violated............. 19

        A.   Sanders has not plausibly alleged that Prison Officials interfered with a liberty or property interest. ............................................... 19

        B.   Sanders has not plausibly alleged that the process Prison Officials provided was constitutionally deficient........................................ 28

    II.   Defendants are entitled to qualified immunity....................................... 42

        A.   Sanders' liberty interest was not clearly established. ......................... 45

B.    The constitutional infirmity of the process Sanders received was not clearly established. .................................................................. 48

Conclusion ........................................................................................... 49

Certificate of Service............................................................................ 50

Certificate of Compliance .................................................................... 51

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Valdez*,
  845 F.3d 580 (5th Cir. 2016) ........................................... 3, 43

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) ...............................................16, 28, 44

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................... 17, 18, 41

*Bailey v. Fisher*,
  No. 13-60715, 647 F. App'x 474 (5th Cir. 2016) ................................. 33

*Batyukova v. Doege*,
  994 F.3d 717 (5th Cir. 2021) ........................................... 44

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................17

*Brosseau v. Haugen*,
  543 U.S. 194 (2004) ........................................... 44

*Brown v. Callahan*,
  623 F.3d 249 (5th Cir. 2010) ........................................... 43

*Brown v. Glossip*,
  878 F.2d 871 (5th Cir. 1989) ...............................................2

*Butler v. S. Porter*,
  999 F.3d 287 (5th Cir. 2021) ....................................... passim

*Carswell v. Camp*,
  54 F.4th 307 (5th Cir. 2022) ........................................... 1

*Cass v. City of Abilene*,
  814 F.3d 721 (5th Cir. 2016) ........................................... 44

*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496 (5th Cir. 2000) ...............................................17

*DePree v. Saunders*,
  588 F.3d 282 (5th Cir. 2009) ........................................... 19

*District of Columbia v. Wesby*,
  138 S. Ct. 577 (2018) ........................................... 44, 47, 49

*Duke v. N. Tex. State Univ.*,
  469 F.2d 829 (5th Cir. 1972) ........................................... 37

*Escobar v. Montee*,
  895 F.3d 387 (5th Cir. 2018) ........................................... 2, 3, 43

*Escobarrivera v. Whitaker,*
   No. 21-30147, 2022 WL 17352178 (5th Cir. Dec. 1, 2022) ...............22, 23, 24, 27

*Flores v. City of Palacios,*
   381 F.3d 391 (5th Cir. 2004)................................................................... 2, 42, 43

*Fuentes v. Shevin,*
   407 U.S. 57 (1972) ................................................................................................ 39

*Geiger v. Jowers,*
   404 F.3d 371 (5th Cir. 2005) ............................................................................ 39

*Greenholtz v. Inmates of Neb. Penal & Corr. Complex,*
   442 U.S. 1 (1979)................................................................................................... 29

*Hare v. City of Corinth, Miss.,*
   135 F.3d 320 (5th Cir. 1998) ............................................................................ 43

*Harlow v. Fitzgerald,*
   457 U.S. 800 (1982) ............................................................................................ 42

*Harper v. Showers,*
   174 F.3d 716 (5th Cir. 1999) ............................................................................ 25

*Hope v. Harris,*
   No. 20-40379, 861 F. App'x 571 (5th Cir. 2021) .......................................... passim

*Hope v. Pelzer,*
   536 U.S. 730 (2002) ............................................................................................ 42

*Jackson v. Stinchcomb,*
   635 F.2d 462 (5th Cir. 1981) ............................................................................ 40

*Jacquez v. Pronunier,*
   801 F.2d 789 (5th Cir. 1986)......................................................................18, 41

*James v. Tex. Collin Cnty.,*
   535 F.3d 365 (5th Cir. 2008) ............................................................................ 18

*Joseph v. Bartlett,*
   981 F.3d 319 (5th Cir. 2020)............................................................................. 44

*Kisela v. Hughes,*
   138 S. Ct. 1148 (2018)........................................................................................ 45

*Kovacic v. Villarreal,*
   628 F.3d 209 (5th Cir. 2010) ............................................................................ 42

*Ky. Dep't of Corr. v. Thompson,*
   490 U.S. 454 (1989) .....................................................................................19, 28

*Laue v. Johnson,*
   No. 04-20486, 117 F. App'x 365 (5th Cir. 2004)........................................... 24

*LaVergne v. Stutes,*
   82 F.4th 433 (5th Cir. 2023).......................................................................passim

*LaViage v. Fite*,
46 F.4th 402 (5th Cir. 2022) ............................................................... 2

*Marks v. Hudson*,
933 F.3d 481 (5th Cir. 2019) ...................................................... 45, 46

*Meza v. Livingston*,
607 F.3d 392 (5th Cir. 2010) ...............................................19, 28, 29

*Mitchell v. Forsyth*,
472 U.S. 511 (1985) ............................................................................ 1

*Moody v. Baker*,
857 F.2d 256 (5th Cir. 1988) ............................................................ 19

*Mullenix v. Luna*,
136 S. Ct. 305 (2015) ...................................................................... 42

*Nerio v. Evans*,
974 F.3d 571 (5th Cir. 2020)...................................................... 44, 48

*Neuwirth v. La. State Bd. of Dentistry*,
845 F.2d 553 (5th Cir. 1988) ........................................................... 40

*Pearson v. Callahan*,
555 U.S. 223 (2009) ........................................................................ 42

*Perry v. Sindermann*,
408 U.S. 593 (1972) ........................................................................ 40

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ...........................................................17

*Salazar v. Molina*,
37 F.4th 278 (5th Cir. 2022) ................................................. 44, 45, 48

*Sandin v. Conner*,
515 U.S. 472 (1995) ................................................................. passim

*Shoats v. Horn*,
213 F.3d 140 (3d Cir. 2000)........................................................ 24, 46

*Striz v. Collier*,
No. 3:18-cv-202, 2020 WL 7868102 (S.D. Tex. Nov. 24, 2020)...................... 32

*Striz v. Collier*,
No. 20-40878, 2022 WL 1421834 (5th Cir. May 5, 2022)............................32, 33

*Taylor v. Acxiom Corp.*,
612 F.3d 325 (5th Cir. 2010)............................................................17

*Tex. Faculty Ass'n v. Univ. of Tex. at Dall.*,
946 F.2d 379 (5th Cir. 1991) ........................................................... 37

*Thompkins v. Belt*,
828 F.2d 298 (5th Cir. 1987) ........................................................... 18

*Thornton v. Gen. Motors Corp.*,
   136 F.3d 450 (5th Cir. 1998) ................................................................. 1
*Valley v. Rapides Par. Sch. Bd.*,
   118 F.3d 1047 (5th Cir. 1997) ......................................................... 36, 37
*Vann v. City of Southaven*,
   884 F.3d 307 (5th Cir. 2018) ................................................................ 44
*Walsh v. Hodge*,
   975 F.3d 475 (5th Cir. 2020) ................................................................ 37
*Wernecke v. Garcia*,
   591 F.3d 386 (5th Cir. 2009) ................................................................ 44
*Wilkerson v. Goodwin*,
   774 F.3d 845 (5th Cir. 2014) ........................................................ passim
*Wilkerson v. Stalder*,
   329 F.3d 431 (5th Cir. 2003) ......................................................... 47, 48
*Wilkerson v. Stalder*,
   No. 00-304-JJB, 2013 WL 6665452 (M.D. La. Dec. 17, 2013), aff'd, 774 F.3d 845
   (5th Cir. 2014) .............................................................................. 47, 48
*Wilkinson v. Austin*,
   545 U.S. 209. (2005) .................................................................... passim

## STATUTES

28 U.S.C. § 1292 ................................................................................. 1

## RULES

Federal Rule of Appellate Procedure 32 .............................................. 50

## I.        Collateral Order Doctrine

Defendants-Appellants are Kristen Gibson, Bryan Reitsma, M. Barthela, Angela N. Davis, and Tina S. Vitolo (collectively, "Prison Officials"). In their individual capacities, Prison Officials appeal an order denying their assertion of qualified immunity in a motion to dismiss for failure to state a claim. ROA.1120; ROA.1135. The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1292 under the collateral order doctrine. *See Mitchell v. Forsyth*, 472 U.S. 511, 521 (1985); *Carswell v. Camp*, 54 F.4th 307, 312 (5th Cir. 2022). Prison Officials' notice of appeal was timely filed on November 28, 2023, comfortably within 30 days of the district court's order regarding motions to dismiss entered November 15, 2023. ROA.1110-20; ROA.1134-37.

## II.       Pendent Appellate Jurisdiction

Prison Officials also respectfully ask the Court to exercise pendent appellate jurisdiction in this appeal. Pendant appellate jurisdiction applies "in rare and unique circumstances where a final appealable order is 'inextricably intertwined' with an unappealable order or where review of the unappealable order is necessary to ensure meaningful review of the appealable order." *Thornton v. Gen. Motors Corp.*, 136 F.3d 450, 453 (5th Cir. 1998). "Pendent appellate jurisdiction may be proper where (1)

the court will decide some issue in the properly brought interlocutory appeal that necessarily disposes of the pendent claim; (2) addressing the pendent claim will further the purpose of officer-immunities by helping the officer avoid trial; (3) the pendent claim would be otherwise unreviewable; or (4) the claims involve precisely the same facts and elements." *Escobar v. Montee*, 895 F.3d 387, 392 (5th Cir. 2018) (internal footnotes omitted).

Prison Officials ask this Court to review the order denying their motions to dismiss for failure to state a claim against them in their official capacities. ROA.1134. "[W]here the defense of qualified immunity may be raised, a plaintiff is required by his pleadings to state facts which, if proved, would defeat a claim of immunity." *Brown v. Glossip*, 878 F.2d 871, 874 (5th Cir. 1989). When raised in a motion to dismiss, the first prong of qualified immunity ("QI") asks whether the constitutional right would have been violated on the pleadings. *Flores v. City of Palacios,* 381 F.3d 391, 395 (5th Cir. 2004). This is same question raised by a motion to dismiss for failure to state a claim that does not invoke QI. *See LaViage v. Fite*, 46 F.4th 402, 405-06 (5th Cir. 2022). When the Court resolves the first prong of QI, it thus also resolves the failure to state a claim. "The question whether a plaintiff has alleged a constitutional violation can be seen as inextricably intertwined with whether an officer has QI." *Escobar*, 895 F.3d at 392.

When Prison Officials moved to dismiss the due process claims against them, they first argued that the pleadings did not plausibly allege a violation of procedural due process. ROA.784-89; ROA.910-17; ROA.940-47; ROA.964-71. Later, Prison Officials invoked this same pleading failure in asserting QI. ROA.791-92; ROA.918-19; ROA.948-50; ROA.972-73. The analysis of the first prong of QI is inextricably intertwined with the failure to state a claim generally. Moreover, addressing the first prong of QI necessarily disposes of the pendent claim against Prison Officials in their official capacities; addressing the official-capacity claim will further the purpose of officer-immunities by helping the officer avoid trial; the official-capacity claim would be otherwise unreviewable (to the extent it seeks prospective injunctive relief); and individual-capacity and official-capacity claims involve precisely the same facts and elements. *See Escobar*, 895 F.3d at 392.

In similar situations, this Court has exercised pendent appellate jurisdiction. *E.g.*, *Anderson v. Valdez*, 845 F.3d 580, 589 (5th Cir. 2016). Prison Officials respectfully ask the Court to exercise pendant appellate jurisdiction here so that this appeal can resolve the entire case.

## ISSUES PRESENTED

Plaintiff James E. Sanders ("Sanders") is an inmate who has been held in administrative segregation since being convicted of "EA" (Escape Attempt) in 2014.

Thereafter, during the timeframe at issue, a three-person committee composed of prison officials (including Defendant-Appellants, "Prison Officials") reviewed his placement in administrative segregation every 180-days. Prison Officials provided Sanders with advanced notice of the hearing, an opportunity to present a written statement, and (typically) the opportunity to present information in person. After the decision, Prison Officials also provided Sanders with the hearing record showing the basis for the decision.

1.    Did Prison Officials deprive Sanders of a liberty interest protected by procedural due process?

2.    If so, did Prison Officials fail to provide to Sanders sufficient process given that liberty interest?

3.    If so, would a reasonable official in Prison Officials' position know that his or her conduct violated procedural due process?

## STATEMENT OF THE CASE

### I.    Relevant Procedural History

Plaintiff James E. Sanders ("Sanders") is an inmate held in the custody of the Texas Department of Criminal Justice ("TDCJ"). ROA.13. On January 31, 2023, Sanders filed his original pro se complaint in this matter naming twenty-four defendants. *See* ROA.13-96. As the district court soon observed, the complaint

referenced exhibits that were not included with the filing. ROA.148. Because the court concluded that "the exhibits might be material to a determination of whether [Sanders] should be allowed to proceed with his claims, the Court [gave] [Sanders] an opportunity to supplement his complaint" with the exhibits referenced therein. ROA.148; ROA.477.

As detailed by the district court's later screening order, Sanders' claims fell into four categories: (1) claims alleging racial discrimination and due process violations related to his confinement in administrative segregation, (2) claims regarding food service, (3) claims involving shortage of staff, and (4) sexual harassment. ROA.13-96, *accord.* ROA.478. The court noted that each category concerned the actions of different defendants at different times, and concluded that they would "be more effectively pursued as separate actions." ROA.478.

The district court allowed Sanders to proceed with his claims arising out of his confinement in administrative segregation. ROA.478-80. The court ordered service of the five defendants whose alleged conduct was implicated: Kristen Gibson, Bryan Reitsma, M. Barthela, Angela N. Davis, and Tina S. Vitolo (collectively, "Prison Officials").; ROA.482-83. The district court dismissed without prejudice the claims related to food service, shortage of staff, and sexual harassment and entered a final judgment as to the other 19 defendants. ROA.479-81. Sanders moved for

reconsideration because he had not yet filed the exhibits mentioned in his original complaint. ROA.489-503. The district court granted the motion, ROA.505, and after Sanders eventually filed the complaint's exhibits, ROA.530-765, again denied his motion for reconsideration. ROA.766.

Following service, Prison Officials filed motions to dismiss based on Sanders' pleadings and subsequently-filed exhibits thereto. ROA.772-93; ROA.899-921; ROA.929-951; ROA.953-75. These motions raised qualified immunity from suit, arguing that Sanders had not alleged plausible claims and, regardless, the facts alleged did not create the reasonable inference that Prison Officials had violated clearly established rights. ROA.772-93; ROA.899-921; ROA.929-951; ROA.953-75. Additional briefing from the Parties followed. ROA.847-79; ROA.886-96; ROA.977-1020; ROA.1029-31; ROA.1038-1107.

On November 15, 2023, the district court issued its order on the pending motions to dismiss. ROA.1110-20. The court dismissed Sanders' remaining claims against Prison Officials to the extent he sought damages against them in their official capacities. ROA.1114. The court also dismissed the race discrimination claim in its entirety for failure to state a claim. ROA.1118-19. The court did not dismiss Sanders' procedural due process claim, concluding that Sanders' allegations and exhibits were sufficient to plead a plausible due process violation. ROA.1115-18. The court also

denied Prison Officials' qualified immunity for the procedural due process claim. ROA.1119-20. Prison Officials promptly appealed the order to the extent it denied their motions to dismiss. ROA.1134-37.

## II. Allegations and Exhibits Regarding Due Process

### A. Prison Officials' Positions

Sanders names Prison Officials for actions taken while they allegedly held State positions: Bryan Reitsma ("Appellant Reitsma") was the Assistant Warden of the Allred Unit; Tina S. Vitolo ("Appellant Vitolo") was a Program Supervisor III in Classification at the Allred Unit; Angela N. Davis ("Appellant Davis") was a Case Manager in Unit Classification at Allred Unit; Kristen Gibson ("Appellant Gibson") was TDCJ's Vice Chairman of Classification; and Marissa Bartholet ("Appellant Bartholet") was a representative of the State Classification Committee ("SCC"). ROA.18-19.

### B. The Process Sanders Has Received

In an exhibit Sanders attaches to the pleadings,[1] Sanders asserts that he was placed in administrative separation in May 2014 after being convicted of a prison

---

[1] Unless otherwise stated, all references to documents other than pleadings contained in the Statement of the Case refer to exhibits that Sanders belatedly filed as attachments to his Original Complaint. *See* ROA.562-63 (listing the exhibits); ROA.564-764 (the exhibits themselves, with ROA.564-650 being the most pertinent to procedural due process).

disciplinary with the acronym "EA." ROA.611. In another letter purporting to quote TDCJ policy, Sanders defines EA as "[a] non-overt act indicating that an escape attempt might be forthcoming, such as planning an escape or having items related to an escape in the cell[;] [e]ven if the offender was charged with escape, if the act was not over and was only an attempt, it should be coded as EA." ROA.579. Sanders states that his 2014 escape attempt conviction stemmed from him "possessing a handcuff key, defeating the restraints, jacking the cuffs, and leaving a restricted area w/out permission."[2] ROA.611.

Sanders begins his recitation of the facts "[i]n or around February or March of 2021," when he became hopeful for his release from administrative segregation. ROA.27. On April 27, 2021, the TDCJ State Classification Committee ("SCC") held a hearing. ROA.27. The Security Detention Review Hearing Record shows that this hearing was a 180-day security detention review held by the SCC to determine whether or not Sanders should remain in his current status at that time. ROA.564-65. The Hearing Record shows that on April 23, 2021, Sanders received advanced notice of the upcoming hearing. ROA.564.

---

[2] In a subsequent filing, Sanders claims he wrote this sentence incorrectly and that he meant to say that his escape attempt conviction was merely for possession of escape paraphernalia. ROA.847. But either way, the salient point remains that Sanders was placed in restrictive housing after being convicted of the disciplinary offense of Escape Attempt.

Sanders alleges that the SCC Security Detention Review hearing was held by three people on April 27, 2021: Roshanda Ferguson (a representative from SCC), Appellant Davis (a representative of the Unit Classification Committee ("UCC"))[3], and an unnamed third party. ROA.27. The April 2017 Hearing Record identifies "current escape risk" as the reason for Plaintiff's initial placement in security detention. ROA.564. The Hearing Record also shows that the SCC decided to keep Sanders in restrictive housing until October 2021 and identified Escape Risk as the basis for its decision. ROA.565. It is undisputed that Sanders received the Hearing Record. ROA.27; ROA.565.

In June and July 2021, Sanders wrote to Appellant Vitolo about him being placed on a 30-day move list. ROA.27. The pleadings do not elaborate on the nature of this "move list," ROA.27, and the exhibits are not explicit in defining the phrase. *E.g.*, ROA.566. The term apparently refers to a list of inmates who are selected by the prison for transfer to different cells every 30 days. *See* ROA.566. In his letter, Sanders asked why he had been placed back on the move list after being off it for two years. ROA.566. Appellant Vitolo explained that he had not been taken off the move

---

[3] While the UCC acronym is not defined on this page of the pleadings, Sanders clarifies that it stands for Unit Classification Committee in another filing. ROA.163.

list—but the prison had not been "doing as much movement due to covid, med restrictions, etc." ROA.567.

After receiving this response, Sanders wrote back to Appellant Vitolo seeking additional clarification regarding the move list. ROA.27; *see also* ROA.568. Appellant Vitolo explained that anyone with an escape code (ES) "is automatically put on the [move] list." ROA.568. But someone with an escape attempt (EA) code is "reviewed by the building Major and he decides whether to put you on the [move] list or not." ROA.568. "The building Major in 2014 remove[d] you & since then there has been a new Major who chose to put you on the list." ROA. 568. Sanders alleges Appellant Vitolo's response to his inquiry contained inaccuracies, ROA.27, but it is undisputed she explained his current move-list status.

On October 22, 2021, Sanders received advanced notice that the next 180-day SCC Security Detention Review hearing would be held during the week of October 25, 2021. ROA.575. On October 26, 2021, the SCC held another 180-day hearing. ROA.27-28; ROA.575. Sanders attended the hearing and provided a written statement. ROA.27-28; ROA.571-74.

During the hearing, Appellant Davis allegedly skimmed Sanders' written statement and Appellant Bartholet asked him to orally summarize it. ROA.27-28. Thereafter, Appellant Bartholet allegedly told him: "I can't release you from Ad-

Seg[;] I can take your statement back to my superiors but I can't release you."
ROA.27-28. Sanders alleges that neither Appellant Davis nor the third member of
the SCC issued any type of recommendation, instead "essentially acquiesc[ed] [to]
[Bartholet]'s decision." ROA.28. The October 2021 Hearing Record shows that the
SCC determined that Sanders posed an escape risk and should remain in his current
status until the next review. ROA.575-76. Again, Sanders received a copy of the
Hearing Record. ROA.576.

In January and February 2022, Sanders sent additional letters complaining
about various aspects of his incarceration, many unrelated to his administrative
segregation. ROA.28; ROA.577-83. Appellant Vitolo responded to Sanders' letters
in March 2022, indicating he was "scheduled for SCC review in April 2022," and
that she would make a copy of Sanders' complaint and send it to the SCC for them
to review. ROA.584. For his complaints unrelated to classification (her area),
Appellant Vitolo indicated that she would "provide a copy to the administration to
handle as they deem necessary." ROA.584.

On April 21, 2022, Sanders received advanced notice that the next 180-day
SCC Security Detention Review hearing would be held during the week of April 26,
2022. ROA.619. On April 26, 2022, Sanders had another 180-day SCC hearing,
which he again attended in person. ROA.30. In his pleadings, Sanders complains

that, in this hearing, Appellant Gibson did not provide him with an "explanation for [his] continued segregation after 8 years." ROA.30. Instead, "Gibson opted to take the file back to Huntsville for a closer look." ROA.30. The next day, Sanders sent an additional four-page letter to Gibson continuing to protest his continued segregation. ROA.598-601. Ultimately, the Hearing Record showing that the SCC decided that Sanders still posed an escape risk and that he would remain in restrictive housing. ROA.619-20. Sanders admits that he received the April 2022 Hearing Record, but alleges it was late. ROA.34.

In June 2022, Sanders wrote again to Appellant Vitolo complaining that he had not yet heard back from the SCC. ROA.603. Appellant Vitolo communicated that SCC had voted to keep him in restrictive housing. ROA.603. When Sanders wrote back to Appellant Vitolo asking for "an opportunity to thoroughly review his classification file to better understand what's REALLY going on," she wrote that "SCC is remaining you, not classification" and "SCC has that info/paperwork." ROA.604 (emphasis in original).

On September 7, 2022, Sanders wrote two letters, the first focused on the move list and the latter regarding his confinement. ROA.32; ROA.611-13. Among the latter's intended recipients was Appellant Reitsma. ROA.611-13. The next day, Sanders submitted a Step 1 grievance requesting release from administrative

segregation. ROA.614-15. In response, TDCJ accelerated Sanders' next 180-day SCC Security Detention Review hearing by some 40 days, setting the hearing for the week of September 15, 2022. ROA.33.

On September 14, 2022, Sanders alleges he spoke to Appellant Reitsma about his SCC paperwork, lack of restrictive housing recommendation, and roaches in the hot boxes. ROA.33. The next day, Appellant Reitsma advised Sanders to direct his SCC questions to the SCC, told Sanders that he (Reitsma) had not yet received Sanders' September 7 letter, and indicated his (Reitsma's) secretaries would re-route the missing letter with multiple addresses to his subordinates if Sanders gave the letter to him. ROA.33.

On September 15, 2022, Sanders had another 180-day Security Detention Review hearing. ROA.33. According to Sanders' pleadings, the three people on the committee were R. Yasko (the SCC representative), Jessica Smith-Grantom (the UCC representative), and Appellant Reitsma. ROA.34-35; *see also* ROA.632-33. Sanders alleges that, during the hearing, he had a conversation with R. Yasko, who stated that he (Sanders) was already doing everything he should be doing for release from administrative segregation and indicated he (R. Yasko) would take the file back to Huntsville for further review. ROA.33. Sanders alleges that Appellant Reitsma made no recommendation. ROA.33.

Thereafter, Sanders alleges he continued to write Appellant Vitolo, who continued to relay information back. ROA.34. On October 19, 2022, Sanders alleges he spoke to "[Appellant] Reitsma about his lack of a recommendation at the 9/15/22 SCC hearing" and "Reitsma stated, 'We only give recommendations [when the SCC representatives] ask for them.'" ROA.35. In November 2022, Appellant Vitolo wrote to Sanders telling him that was still waiting on a response from SCC. ROA.35; *see also* ROA.624. On January 9 and 20, 2023, Sanders sent additional communications to Appellant Vitolo inquiring about the SCC's decision, but at that time no decision had been made stemming from the September 2022 SCC Security Detention Review hearing. ROA.35.

## C.  Sanders' Experience in Administrative Segregation

Despite its length, Sanders' Original Complaint alleges little about the actual restrictions placed him attendant upon his placement in administrative segregation. *See* ROA.23-89. Most of the allegations about his confinement are located in the fact sections pertaining to the dismissed claims regarding food service (ROA.36-57), shortage of staff (ROA.58-85), and an alleged sexual harassment incident involving an unwanted double entendre (ROA.86-89). For example, Sanders complains about pancakes (too frequent and undercooked), watered-down syrup, and a kitchen roach infestation that resulted in fumigation. ROA.36; ROA.48. The pleadings do not

allege that the prison food would be better if Sanders were not in general population. *See generally* ROA.36-57.

Sanders also alleges that the prison had significant staffing shortages that led to less recreation time and fewer showers. *See* ROA.58-85. According to the pleadings, these staffing shortages affected the entire prison. *See generally* ROA.58-85. The allegations do suggest that the prison would send groups of inmate to engage in recreation and take showers in batches at the same time. ROA.59. And Sanders was permitted to exercise outside in the A-pod rec yard, sometimes with other inmates. ROA.70; ROA.70. Beyond parsing the allegations related to other claims, Sanders alleges little about his restrictive custody.

## SUMMARY OF THE ARGUMENT

The district court erred in denying Prison Officials' motion to dismiss Sanders' procedural due process claim for two reasons. *First*, Prison Officials did not violate Sanders' due process rights. To start, Sanders lacks a constitutionally protected liberty interest that would entitle him to process under the Fourteenth Amendment. Sanders cannot show that he has experienced an atypical or significant hardship in relation to the ordinary incidents of prison life. *See Butler v. S. Porter*, 999 F.3d 287, 296 (5th Cir. 2021); *Sandin v. Conner*, 515 U.S. 472, 484 (1995). His

restrictive housing assignment (administrative segregation) does not interfere with a liberty or property interest.

Even if Sanders had a liberty interest stemming from his restrictive housing, the pleadings do not create the reasonable inference that Prison Officials withheld sufficient process. All three factors used to evaluate the sufficiency of particular procedures point to this conclusion: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Wilkinson v. Austin*, 545 U.S. 209, 224-25. (2005). The process described in his pleadings is sufficient to satisfy constitutional mandates. Based on the details provided in his own pleadings, Sanders acknowledges the protection of his due process rights.

*Second*, even if the pleadings are sufficient to create the reasonable inference that Prison Officials' alleged conduct violated Sanders' right to procedural due process, qualified immunity bars his claim. To overcome qualified immunity, "existing precedent must have placed the ... constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). And any procedural due

process violation emerging from the pleadings in this case is, at most, highly debatable. The duration and condition of Sanders' restrictive housing render his liberty interest uncertain and, if anything, the precedent clearly indicates he received *sufficient* process. Therefore, the claim is barred by the qualified immunity asserted in Prison Officials' motion to dismiss.

## STANDARD OF REVIEW

"This court reviews de novo the grant of a motion to dismiss for failure to state a claim." *Taylor v. Acxiom Corp.*, 612 F.3d 325, 331 (5th Cir. 2010). In considering such a motion, consideration is limited "to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). To avoid dismissal, a plaintiff must plead sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. While courts must accept the plaintiff's factual allegations as true, courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005); *see also Iqbal*, 556 U.S. at 679.

The district court held that Sanders had stated a cause of action for procedural due process under Section 1983. *See* ROA.1118. "To state a section 1983 claim, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) (internal quotes omitted). "In order to successfully plead a cause of action in § 1983 cases, plaintiffs must enunciate a set of facts that illustrate the defendants' participation in the wrong alleged." *Jacquez v. Pronunier*, 801 F.2d 789, 793 (5th Cir. 1986). "Under [S]ection 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

For the reasons set forth below, Sanders' procedural due process rights have not been violated. Significantly, Sanders has failed to demonstrate that he has a liberty interest at stake because he cannot show that he has experienced any atypical or significant hardship in relation to the ordinary incidents of prison life. Similarly, Sanders' pleadings do not create the inference that Prison Officials violated his right

to procedural due process. But even if this were otherwise, Prison Officials are still entitled to qualified immunity because the alleged procedural due process violation was not clearly established. Moreover, their conduct was reasonable in light of then-clearly established law.

## I.     Sanders' procedural due process rights have not been violated.

The threshold requirement of a procedural due process claim is the government's deprivation of a liberty or property interest. *DePree v. Saunders*, 588 F.3d 282, 289 (5th Cir. 2009). "The Supreme Court has adopted a two-step analysis to examine whether an individual's procedural due process rights have been violated." *Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010). "The first question 'asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Id.* (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

### A.     Sanders has not plausibly alleged that Prison Officials interfered with a liberty or property interest.

Sanders fails to state a procedural due process claim stemming from his administrative segregation. "As a general rule, an ' inmate has neither a protectible property nor liberty interest in his custody classification.'" *Butler v. S. Porter*, 999 F.3d 287, 296 (5th Cir. 2021) (quoting *Moody v. Baker*, 857 F.2d 256, 257–58 (5th

Cir. 1988) (per curiam)). "Great deference is accorded to prison officials in their determination of custodial status." *Id.* "[S]egregated confinement is not grounds for a due process claim unless it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In resolving whether a prisoner has a liberty interest in his custodial classification, courts "look specifically at  the [1] severity and [2] duration of restrictive conditions to decide whether a prisoner has a liberty interest in his custodial classification." *Id.*

In *Wilkinson v. Austin*, the Supreme Court considered a procedural due process claim brought by an inmate bringing a procedural due process challenge his placement in the Ohio State Penitentiary ("OSP"). 545 U.S. 209, 213-14 (2005).[4] To determine whether the placement implicated a protected liberty interest, the Court first considered the severity of the confinement. *See id.* at 223–24. Inmates placed in OSP were confined without human contact, in constant dim lighting (no day/night cycles), and with solitary exercise in a small room available only one hour per day. *Id.* at 214-15, 223-24. As far as duration, it was indefinite—"limited only by

---

[4] Because of the case name's similarity to another seminal inmate due process case, *Wilkerson v. Goodwin*, 774 F.3d 845 (5th Cir. 2014), to avoid confusion, subsequent references to *Wilkinson v. Austin*, 545 U.S. 209 (2005) shall refer to the holding as "*Austin*" rather than "*Wilkinson.*"

an inmate's sentence." *Id.* 214-15. Concluding that the inmates had a liberty interest in avoiding assignment to OSP, the Supreme Court noted that "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.* at 224.

In *Wilkerson v. Goodwin*, this Court considered a procedural due process claim brought by an inmate who had been held in closed-cell restriction ("CCR") for 39 years. 774 F.3d 845, 855 (5th Cir. 2014). "Coupled with this extraordinary duration, the conditions in CCR are sufficiently restrictive as to constitute an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Id.* (quoting *Sandin*, 515 U.S. at 484). As in *Austin*, the conditions at issue involved the prisoner being isolated in his cell for 23 hours a day, with one hour of exercise per day in isolated areas, with significant limitations on human contact. *Id.* at 855. The *Wilkerson* plaintiff's conditions were superior in some respects—he had "some contact visits, telephone privileges, peer counseling, and correspondence courses," which this Court suggested "might become material" were the duration less lengthy. *Id.* at 855-56. But viewed collectively with "the extraordinary length of time that [the plaintiff] ha[d] been held in such conditions," this Court held that a liberty interest existed. *Id.*

In *Butler*, this Court considered a case brought by an inmate who had been held in the prison's Special Housing Unit ("SHU") without process for over 280 days. 999 F.3d at 291. He alleged that he was being held in "harsh conditions" and that "his extended confinement there could affect his mental health." *Id.* Despite his confinement in SHU, the inmate could take courses, had weekly access to a telephone, and could exercise outside. *Id.* at 296. The district court *sua sponte* dismissed this claim, and this Court affirmed. *Id.* at 296. The Court held that he was "unable to show that the conditions in the SHU were severe enough to implicate due process concerns." *Id.* The Court also held that 280 days was insufficient from a durational standpoint. *Id.*

In *Escobarrivera v. Whitaker*, an admittedly unpublished opinion, this Court considered a due process claim brought by an inmate in closed custody restriction for four and a half years. No. 21-30147, 2022 WL 17352178, at *1 (5th Cir. Dec. 1, 2022) (per curiam). During that time, he had been "confined for twenty-three hours (or at least twenty-two hours) a day in a cell by himself, [ate] his meals alone, [was] prevented from attending church services, and his confinement is allegedly 'indefinite.'" *Id.* at *4. But this Court held that this did not amount to a "deprivation of almost any environmental or sensory stimuli and of almost all human contact," as in *Austin*, because the cell had bars, he could interact with others during his hour of

release, he had three additional one-hour sessions a week outside, and he had access to visitation twice per month. *Id.* In conjunction with the four-and-a-half years of confinement, the *Escobarrivera* Court held that the inmate lacked a protected liberty interest in his custodial status. *Id.*

Even more recently, on September 25, 2023, this Court considered a case in which the inmate-plaintiff was held in restrictive custody, also known as solitary confinement, from August 2012 to June 2017 and then again in October 2018 (after an unsuccessful escape attempt). *LaVergne v. Stutes*, 82 F.4th 433, 435 (5th Cir. 2023). He "alleged he was confined to his cell twenty-three hours per day" for roughly five years, but "was nonetheless 'permitted two contact visits per month,' 'was able to make phone calls, cook food, or exercise' an hour per day, 'was permitted outdoor recreation for three hours per week, albeit in a limited space,' and was not 'deprived of conversation or communication with other inmates.'" *Id.* at 436. The lower court found "that [the plaintiff]'s conditions were not 'sufficiently severe to give rise to a liberty interest'" and this Court affirmed, concluding that the judge "committed no reversible error in dismissing [the] Fourteenth Amendment due process claim." *Id.* at 437.

Sanders' pleadings and exhibits suggest that he has been in administrative segregation since receiving an escape attempt disciplinary conviction in 2014. *See*

ROA.579, ROA.611. As far as duration is concerned, this Court has held that 39 years of confinement clearly favors a liberty interest (*Wilkerson*, 774 F.3d at 855), while four or five years disfavors it (*LaVergne*, 82 F.4th at 436-37; *Escobarrivera*, 2022 WL 17352178, at *4). As noted in *Wilkerson*, the Third Circuit has held that eight years favors a liberty interest. 774 F.3d at 855 (citing *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000)). But this Court has only "assume[d] *arguendo* that [] eight years of confinement in administrative segregation constitutes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Laue v. Johnson*, No. 04-20486, 117 F. App'x 365, 366 (5th Cir. 2004) (per curiam) (quoting *Sandin*, 515 U.S. at 484).

But assuming *arguendo* that the timeframe at issue in this case favors the liberty interest—a not implausible, albeit not clearly-established conclusion—that still leaves the severity of Sanders' restrictive housing. Of this, his pleadings and exhibits say little. *See* ROA.27-89. The facts related to administrative segregation allege almost nothing about his actual experience of being there. *See* ROA.27-35. He complains that being placed on a 30-day move list resulted in him being obliged to transfer to a new cell periodically, typically between 30 and 50 days. *See* ROA.27, 566. But nothing suggest that these cells were materially different from one another. *See* ROA.27, 566-68. And this Court has already rejected the proposition that an

even-more-frequent move list implicates a liberty interest. *Harper v. Showers*, 174 F.3d 716, 717-18 (5th Cir. 1999).

In *Harper*, the inmate held that he had been placed on a weekly move list and that this change in classification without process violated procedural due process. 174 F.3d at 717-18. This Court held that the district court did not abuse its discretion in dismissing the inmate's claim as it related to his classification. *Id.* at 719. The Court held that, as a matter of law, the inmate did not have a property or liberty interest in being placed on the weekly move list, which the opinion characterized as classification. *Id.* "Because [the inmate] relies on a legally nonexistent interest, any alleged due process or other constitutional violation arising from his classification is indisputably meritless." *Id.*

Sanders' other allegations and grievances seem largely disconnected from his restrictive housing. *See* ROA.36-89. For example, Sanders' pleadings allege a roach infestation occurred in 2021, but the infestation was not localized to administrative segregation—the kitchen was the problem. *See* ROA.36. Sanders complains about being served too many pancake breakfasts ("10-out-of-13 days"), but again, nothing about that complaint suggests it is related to his restrictive housing. *See* ROA.36. Water-down syrup served with the French toast is not related. *E.g.*, ROA.48. Nothing in the allegations suggest that the inmates in general population receive

superior syrup with their breakfasts. *See* ROA.48. In 20 pages of complaints about the quantity, quality, and delivery of food, nothing in the pleadings suggests that these food deficiencies stem from his placement in administrative segregation. *See* ROA.36-57.

Similarly, Sanders' complaints about prison staffing do not favor a liberty interest—if anything, they favor the opposite conclusion. *See* ROA.58-85. For example, while he complains that he was deprived of recreation and a shower due to a staffing issue, the allegation also reveals that he had contact with other inmates. *See* ROA.59. He alleges that recreation occurs with "20ppl" at a time and showers with "24 ppl" at a time, which suggests that he was not experiencing the extreme isolation that the Supreme Court identified as so atypical and significant in *Austin*. *Compare* ROA.59, *with Austin*, 545 U.S. at 213-14, 223-24.

Admittedly, Sanders describes staffing issues affecting access to showers and recreational time, but the entire thrust of his complaint is that these problems affected *everyone*. *See* ROA.58-85. It is also clear that Sanders was permitted to exercise outside (not an enclosed space), in the communal recreation yard (the "A-pod rec yard"), sometimes with other inmates. ROA.70, 72 (complaining that he and another inmate were placed in the rec yard during the hottest part of the day). While asserted to support an unrelated and dismissed claims, the allegations' import for

procedural due process is (1) the degree of contact and interaction with others Sanders had while in administrative segregation, and (2) the way in which he was *not* stuck in his cell all the time. ROA.70, 72.

Here, Sanders has not alleged facts regarding the nature of his confinement that, together with the period at issue, are sufficient to demonstrate the existence of a liberty interest. While his time in administrative segregation is greater than in those opinions where this Court has held that the inmate lacked a liberty interest, it is also less than in those opinions where the Court has held that the inmate *did* have a liberty interest. *Wilkerson*, 774 F.3d at 855; *LaVergne*, 82 F.4th at 436-37; *Escobarrivera*, 2022 WL 17352178, at *4. And the circumstances (as opposed to duration) of Sanders' confinement appears more similar to the inmate's situation in *LaVergne*—where the inmate still had some outdoor recreation and contact with other inmates—than the inmate in *Wilkerson*—where the inmate had less contact with other human beings. *Compare LaVergne*, 82 F.4th at 436-37 (holding that the plaintiff did not have a liberty interest), *with Wilkerson*, 774 F.3d at 855-56 (holding that the plaintiff did have a liberty interest).

The district court held that the facts pleaded and the documents Sanders attached showed conditions that "arguably meet the test" to constitute a liberty interest. ROA.1116. As discussed more below, a liberty interest that is merely

"arguable" is not "beyond debate," and therefore Prison Officials are entitled to qualified immunity from suit. *Compare* ROA.116, *with Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). But setting that aside for now, Prison Officials respectfully submit that the pleadings (which, in this context, include the exhibits attached to the complaint) have not demonstrated that Sanders' confinement "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin*, 515 U.S. at 484.

### B. Sanders has not plausibly alleged that the process Prison Officials provided was constitutionally deficient.

Even if the Court concludes that the allegations and exhibits support the existence of a liberty interest, and they do not, the interest is only the first element in a due process claim. The second element "'examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Meza*, 607 F.3d at 399 (quoting *Ky. Dep't of Corr*, 490 U.S. at 460). Sanders' pleadings do not satisfy this second element.

To determine what process is due, courts consider three factors: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and

administrative burdens that the additional or substitute procedural requirement would entail." *Austin*, 545 U.S. at 224-25. "The Supreme Court has afforded a broad spectrum of process depending on the deprivation at issue." *Meza*, 607 F.3d at 404. And "[i]t is axiomatic that due process is flexible and calls for such procedural protections as the particular situation demands." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12 (1979).

In *Austin* itself, for example, the Supreme Court upheld the process provided when inmates were placed and kept in the extreme, potentially indefinite isolation of OSP (as previously described). *See* 545 U.S. at 214-17, 225-30. Significant for the purposes of this appeal, after the initial decision, an inmate's placement in OSP was "reviewed on at least an annual basis." *Id.* at 217. In conducting this review, a form is prepared; a three-member committee reviews the classification and holds a hearing; the inmate is provided with written notice in advance of the hearing; and the inmate may attend the hearing but not call witnesses. *Id.* at 216. If the decision is to keep the inmate in OSP, a report is submitted to the warden. *Id.* at 217. If the warden agrees, he provides agreement and reasons to the Bureau of Classification for a decision. *Id.* The inmate receives the recommendations and may object before the Bureau makes the decision. *Id.*

In upholding the sufficiency of this process, the Supreme Court placed great emphasis on the third factor—the State's interest—which the Court described as "a dominant consideration" "[i]n the context of prison management, and in the specific circumstances of this case." *Austin*, 545 U.S. at 227. "The State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Id.* The Court also recognized "[t]he problem of scarce resources." *Id.* at 228. "[C]ourts must give substantial deference to prison management decisions before mandating additional expenditures for elaborate procedural safeguards when correctional officials conclude that a prisoner has engaged in disruptive behavior." *Id.* The Court held that a balance of the factors "yields the conclusion that [the process] is adequate to safeguard an inmate's liberty interest in not being assigned to OSP." *Id.*

In 2021, this Court considered a procedural due process claim brought by an inmate alleging he had been placed in solitary confinement "in a cell 'no larger than a parking space' twenty-three to twenty-four hours a day for over two decades." *Hope v. Harris*, No. 20-40379, 861 F. App'x 571, 575 (5th Cir. 2021) (per curiam). His placement also "render[ed] him ineligible for parole." *Id.* at 580. In considering the private interest affected by the official action, this Court emphasized that the analysis "'must be evaluated within the context of the prison system and its

attendant curtailment of liberties.'" *Id.* (quoting *Austin*, 545 U.S. at 225). Courts must "look to how much liberty [the inmate] is deprived of over and above what would normally be incident to prison life." *Id.* And based on that framework, the inmate's interest was "low." *Id.*

Next, this Court considered the risk of erroneous deprivation. Again quoting *Austin*, this Court considered whether the inmate had (1) "'notice of the factual basis leading to consideration for [solitary] placement,'" (2) "'a fair opportunity for rebuttal,'" and (3) "an opportunity 'to submit objections prior to the final level of review,'" all of which decrease the likelihood of erroneous deprivation. 861 F. App'x 571 (quoting *Austin*, 545 U.S. at 225-26). This Court noted that the inmate had notice of the reason he was in solitary confinement—his escape record. *Id.* This remained true even though the inmate alleged that his designation as an escape risk had been removed. *Id.* The inmate had also alleged that he had attended the hearings and made statements, which this Court also held weighed against the risk of erroneous deprivation. *Id.*

"Finally, turning to the government's interest, Texas's 'first obligation must be to ensure the safety of . . . the public.'" *Hope*, 861 F. App'x at 580 (quoting *Austin*, 545 U.S. at 227). This Court also noted the scarce resources of prison systems and the substantial deference afforded to prison management decisions. *Id.* Ultimately,

this Court held that even based on the pleadings, the inmate had been afforded "a fair opportunity for rebuttal," even if unfruitful. *Id.* at 581. As such, "Texas's interest . . . weighs in favor of finding that [the inmate] ha[d] been given adequate process." *Id.* at 581-82.

In 2022, this Court again considered the sufficiency of the due process protections for a TDCJ inmate—this time one who was confined to administrative segregation for 19 years. *Striz v. Collier*, No. 20-40878, 2022 WL 1421834 (5th Cir. May 5, 2022). As described by the district court, the inmate alleged that he had been confined for no valid penological reason and that his classification reviews were a "perfunctory sham." *Striz v. Collier*, No. 3:18-cv-202, 2020 WL 7868102, at *1 (S.D. Tex. Nov. 24, 2020). The record showed the plaintiff "(1) [was] provided with advanced notice of the review hearings; (2) [was] provided an opportunity to speak at the hearings, (3) [could] submit written statements from witnesses, (4) [could] submit other documentary evidence, and (5) [was] given notice of the factual basis for the review committees' decision." *Id.* at *10. The record also showed that he had received regular reviews of his unit classification and six-month reviews by the SCC. *Id.* The district court concluded that he had failed to show the process he received was constitutionally deficient. *Id.* at *11.

On appeal, this Court affirmed the dismissal of the due process claims because "the prison provided [the inmate] with the process that is due through advance notice of review hearings and an opportunity to speak and submit evidence at those hearings." *Striz*, 2022 WL 1421834 at *1 (citing *Bailey v. Fisher*, No. 13-60715, 647 F. App'x 474, 477 n.9 (5th Cir. 2016) (unpublished per curiam)). Significantly, this Court did not address whether the inmate had a liberty interest, nor whether the defendants were entitled to qualified immunity (as the inmate had sought injunctive relief). *Id.* at *1. Instead, this Court's opinion rested entirely on the conclusion that adequate process had been provided. *Id.*

Given this precedent, Sanders' pleadings confirm that he has received all the process to which he is constitutionally entitled. Sanders contends he was initially placed in administrative segregation as the result of escape attempt conviction. ROA.579; ROA.611. At least during the time period alleged, the pleadings show that Sanders has received a Security Detention Review hearing regarding his restrictive housing every 180-days. *See* ROA.27-35; ROA.564-65; ROA.575-76; ROA.619-20; ROA.632-33. The prison officials provide him with advanced notice of these hearings. ROA.564; ROA.575; ROA.619; ROA.632. Sanders has appeared in person at most of these hearings and has submitted written information for the SCC's consideration. *See* ROA.27-35.

Moreover, in-between the 180-day SCC Security Detention Review hearings, Sanders has had extensive written and oral communications about his restrictive housing, the reasons for his placement, and the process. ROA.34-35; ROA.582-85; ROA.604; ROA.624. In particular, Appellants Vitolo and Reitsma have reviewed the information he sent and provided clarifying information about the process to him. ROA.582-85; ROA.604; ROA.624.

This process is similar to that described and upheld in *Austin*. *See* 545 U.S. at 216-17. The three-member committee presiding over a hearing in which the inmate receives advanced notice and can attend or submit documents—that parallel holds here. *See id.* at 216. Moreover, OSP placement in *Austin* was only "reviewed on at least an annual basis," whereas Sanders' confinement in administrative segregation is reviewed in a SCC Security Detention Review hearing every 180 days. *Compare id.* at 217, *with* ROA.27-33. And, as discussed in the context of the liberty interest, the severity of the curtailment of the inmates' liberty in *Austin* was greater than what Sanders has alleged in this case.

This Court's recent TDCJ inmate due process holdings in *Hope* and *Striz*, while unpublished, also strongly suggest the process that Sanders has received is constitutionally sufficient. With these holdings in mind, each of the three factors that courts use to evaluate the sufficiency of particular procedures weigh in favor of

Prison Officials and the sufficiency of the process that Sanders has received. *See Austin*, 545 U.S. at 224-25.

Private Interest Affected. First, for the reasons this Court articulated in *Hope*, Sanders' private interest is—while "more than minimal"—still "low" because the liberty deprivation is not significantly above and beyond what would normally be incident to prison life at the Allred Unit. *See Hope*, 861 F. App'x at 580. Indeed, much of what Sanders complains about in the pleadings would be common to most inmates at his unit. *See* ROA.36-57.

Risk of Erroneous Deprivation. Second, the risk of erroneous deprivation in Sanders' case is low. Sanders is provided with notice in advance of the hearings and the basis for the decisions thereafter. *See* ROA.564-65; ROA.575-76; ROA.619-20; ROA.632-33. The various officials who have reviewed his case clearly consider him an escape risk—the SCC Security Detention Review Hearing Records have repeatedly identified escape risk as the basis for the decisions. *E.g.*, ROA.564-65; ROA.575-76; ROA.619-20; ROA.632-33. Sanders clearly knows as much because his protests typically focus on whether he genuinely presents an escape risk. *E.g.* ROA.578 (complaining that another inmate with an escape attempt conviction was released from administrative segregation, while his escape attempt remains an obstacle). As in *Hope*, Sanders knows the basis of his placement in restrictive

housing—even if he thinks Prison Officials' ongoing escape risk concern is unfair or overstated. 861 F. App'x at 580.

The record demonstrates that Sanders has had more than a fair opportunity for rebuttal. He has submitted many verbal statements protesting his administrative segregation, both during the 180-day SCC Security Detention Review hearings and in between. *See* ROA.564-68; ROA.571-650. Nor have his complaints fallen completely on deaf ears—he has received many written responses, especially from Appellant Vitolo. ROA.567-68; ROA.584; ROA.597; ROA.602-04; ROA.624; ROA.640. On one occasion, a hearing was accelerated by more than a month in response to his demand. ROA.33. And every 180 days or so, Sanders has had an opportunity to submit his objections prior to the final level of review. *See Hope*, 861 F. App'x at 580; *Austin*, 545 U.S. at 225.

Sanders' largely conclusory allegations characterizing the process as a sham do not overcome the strong presumption that the various officials involved in the review of his classification status have acted in good faith and that their stated concern about the escape risk posed by Sanders are disingenuous or that the outcome is a foregone conclusion. "[B]ias by an adjudicator is not lightly established." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1052–53 (5th Cir. 1997). "The movant must overcome two strong presumptions: (1) the presumption of honesty and integrity of

the adjudicators; and (2) the presumption that those making decisions affecting the public are doing so in the public interest." *Id.* (quoted with approval *Walsh v. Hodge*, 975 F.3d 475, 482 (5th Cir. 2020)). Allegations of prejudice in a hearing body "must be based on more than mere speculation and tenuous inferences." *Duke v. N. Tex. State Univ.*, 469 F.2d 829, 834 (5th Cir. 1972), *accord Tex. Faculty Ass'n v. Univ. of Tex. at Dall.*, 946 F.2d 379, 388 (5th Cir. 1991). The pleadings do not go beyond such speculation and tenuous inference.

Government Interest. Third, as both this Court and the Supreme Court have repeatedly recognized, prisons have a strong interest in ensuring the safety of the public, the prison officials, and other inmates. *See Hope*, 861 F. App'x at 580; *Austin*, 545 U.S. at 227. Substantial deference is afforded "to prison management decisions before mandating additional expenditures for elaborate procedural safeguards." *See Hope*, 861 F. App'x at 580; *Austin*, 545 U.S. at 228. Sanders has already been found guilty of an escape attempt. And he receives a hearing every 180 days to ensure that the security concerns that led to his restrictive housing have not gone stale. The Constitution does not require more.

In concluding otherwise, the lower court gave insufficient deference to Prison Officials and over-relied on allegations that were simply not relevant to the due process inquiry. For example, the order noted that "[t]hough there are three

members of the committee reviewing [Sanders'] placement," the local members "only make a recommendation if asked." ROA.1118. But that hardly invalidates the process—any more than the presence of a vocal and opinioned jury foreman renders a jury trial a nullity. If, as alleged by Sanders, the opinion of the SCC representative on the committee carried more weight and the other two committee members only offered their opinions if asked—that disproportionate influence does not render the process constitutionally meaningless. It just means that two unit-level committee members tended to defer to the member who would have been involved in more of these decisions.

As for the order's assertion that "the committee itself appears to have no authority since the file is always taken back to the unidentified supervisors in Huntsville," *see* ROA.1118, this conclusion is unwarranted. There are allegations indicating that SCC committee members wanted to take Sanders' paperwork "back to Huntsville" for further review. *See*, *e.g.*, ROA.27-28; ROA.34. And, admittedly, Sanders alleges that Defendant Bartholet told him—at a hearing in which he both submitted a written statement and gave an oral presentation—that she could not release him but she could take his statement back to her supervisors. *See* ROA.28. But, again, that does not mean that the periodic process that Sanders has received twice a year is constitutionally meaningless.

If Appellant Bartholet told Sanders she would need to go back and discuss his case with her supervisors before releasing him, that factual allegation does not mean she violated his procedural due process rights. If anything, it indicates the degree to which the information he was providing was being received and considered. And Sanders' pleadings allege it was "Barthela's [sic] decision." ROA.28. The district court errs by ignoring this allegation.

The district court also determined that "[n]o plausible reason for the decisions to [keep Sanders in restrictive housing] is ever given," dismissing the stated concern that Sanders continues to present an escape risk as "[r]ote repetition" that "effectively denies [Sanders] any possibility of release." ROA.1118. This determination errs by conflating outcome with process. *See* ROA.1118. In effect, the district court concluded that because Sanders had plausibly alleged that he no longer presented a security risk but was still in restrictive housing, that meant he did not have a meaningful opportunity to challenge his placement. But a prisoner has no "federally protected liberty interest in having these grievances resolved to his satisfaction." *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005). What matters is the sufficiency of the notice and the opportunity to be heard. *See Fuentes v. Shevin*, 407

U.S. 57, 80 (1972). Even a victorious plaintiff in a procedural due process case is not guaranteed their preferred outcome as a result.[5]

Consider that, in *Hope*, this Court noted the plaintiff's allegation "that the basis for his present placement in solitary remains 'an incident that will never change from over 23 years ago.'" 861 F. App'x at 580. Under the district court's reasoning, that allegation would weigh in the plaintiff's favor because it would indicate that the process was a mere sham and that the plaintiff was being "denied any possibility of release." *Compare id.*, *with* ROA.1118. But instead this Court concluded that the allegation demonstrated only that plaintiff had received notice regarding the basis for the decision. *Hope*, 861 F. App'x at 580. In so doing, this Court avoided the mistake of judging sufficiency of process based on a complaint about the purported injustice of that process's outcome.

---

[5] *E.g.*, *Jackson v. Stinchcomb*, 635 F.2d 462, 469 (5th Cir. 1981) (noting in the context of employment termination that "the remedy for a pretermination due process violation is to order reinstatement pending a hearing, or, where there is a post-termination hearing, to award back pay for the period between the dismissal and the conclusion of the post-termination hearing"); *Perry v. Sindermann*, 408 U.S. 593, 603 (1972) (holding that if a professor did have a property interest in his employment, the proper remedy would be a hearing, not reinstatement); *Neuwirth v. La. State Bd. of Dentistry*, 845 F.2d 553, 560 n.12 (5th Cir. 1988) (noting that if the plaintiff's sole claim was procedural due process, he "would be entitled to no more than another hearing before the Board, because that is the remedy for due process violations").

That said, even based on the pleadings, it is not implausible that someone convicted of escape attempts might still present security concerns even years later. Again, the purpose of the process is for prison officials to make that decision after considering all the facts, including the information submitted by the inmate. "Courts must give substantial deference to prison management decisions before mandating additional expenditures for elaborate procedural safeguards when correctional officials conclude that a prisoner has engaged in disruptive behavior." *Austin*, 545 U.S. at 212. Here, the lower court erred by giving Prison Officials no such deference, giving short shrift to the adequacy of the process based heavily on second-guessing the wisdom of its result.

Finally, while Prison Officials' entire argument prior to this point has framed the issue as though the defendant were "TDCJ," that is not the proper framework. The question is, after all, not whether the cumulative actions of dozens of people collectively violated Sanders' right to due process, but whether each defendant's individual, non-aggregated actions did. *See Jacquez*, 801 F.2d at 793; *Iqbal*, 556 U.S. at 677. While each person is sued for having participated in the process Sanders received, other than simply failing to release him from ad seg, it is unclear what they are accused of doing wrong or what process he contends each should have provided during the underlying events.

For these reasons, Prison Officials ask the Court to reverse the district court order denying their motions to dismiss. Sanders' administrative segregation has not imposed an atypical and significant hardship upon him in relation to the ordinary incidents of prison life. Regardless, the 180-day Security Detention Review hearings satisfy the Fourteenth Amendment. The pleadings thus do not allege a plausible violation of procedural due process.

## II.      Defendants are entitled to qualified immunity.

Qualified immunity "shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation omitted). Once a state official has asserted qualified immunity, the burden shifts to the plaintiff to show that qualified immunity does not bar her recovery. *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010).

The qualified immunity analysis has two steps. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "First, [courts] assess whether a statutory or constitutional right would have been violated on the facts alleged." *Flores,* 381 F.3d at 395. Second,

courts "determine whether the defendant's actions violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "The second prong of the qualified immunity test is better understood as two separate inquiries: whether the allegedly violated constitutional rights were *clearly established at the time of the incident*; and, if so, whether the conduct of the defendants was objectively unreasonable in the light of that then clearly established law." *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 328 (5th Cir. 1998) (emphasis in original); *see also Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

As noted, Prison Officials ask the Court to exercise pendent appellate jurisdiction and review the district court's denial of their motion to dismiss for failure to state a procedural due process claim against them in both their individual and official capacities. *See Escobar*, 895 F.3d at 392 ("The question whether a plaintiff has alleged a constitutional violation can be seen as inextricably intertwined with whether an officer has QI."); *Anderson*, 845 F.3d at 588-89 (exercising pendent appellate jurisdiction over an order denying a motion to dismiss a claim against a defendant in his official capacity in an interlocutory appeal of an order denying qualified immunity raised in his individual capacity). Should this Court reach the second prong of qualified immunity, Prison Officials ask the Court to reverse the

district court order denying their motion to dismiss because their purported violations of procedural due process were not clearly established at the time of the underlying events.

Turning to the second qualified immunity prong, "[t]here are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). Under the first approach, the plaintiff may "identify a case" or "body of relevant case law" in which "an officer acting under similar circumstances . . . was held to have violated the [Constitution or other applicable federal law]." *Joseph v. Bartlett*, 981 F.3d 319, 325 (5th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)). Under the second approach, "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). A right is clearly established if the law is clear in a particularized sense, such that a reasonable official would be put on notice that her conduct is unlawful and violates the right in question. *Wernecke v. Garcia,* 591 F.3d 386, 392–93 (5th Cir. 2009). The violation of law must be "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

To clearly establish law, the precedent must (1) hold that a violation of law occurred, *Nerio v. Evans*, 974 F.3d 571, 575–76 (5th Cir. 2020); *Salazar v. Molina*, 37

F.4th 278, 286 (5th Cir. 2022); (2) not define the law at a high degree of generality, *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (per curiam) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 732-33 (5th Cir. 2016) (per curiam)); (3) be precedential within the circuit in which the alleged actions took place, *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019); *Salazar*, 37 F.4th at 286; and (4) have existed at or before the time of the alleged violation, *Kisela v. Hughes*, 138 S. Ct. 1148, 1154 (2018); *Salazar*, 37 F.4th at 286.

Here, neither Sanders' claim to a liberty interest nor the inadequacy of the process he received are "beyond debate," and therefore his procedural due process claim remains barred.

### A. Sanders' liberty interest was not clearly established.

Prison Officials respectfully submit that it was not clearly established that Sanders' continued presence in administrative segregation deprived him of a liberty interest. "[S]egregated confinement is not grounds for a due process claim unless it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Butler*, 999 F.3d at 296 (quoting *Sandin*, 515 U.S. at 484). But the severity and duration of the restrictive conditions alleged in this case are not so extreme as to render obvious the existence of a liberty interest arising from those conditions. *See id.*

The duration of the confinement in this case falls somewhere in between those holdings where a liberty interest has been found and when it has been disclaimed. *See Wilkerson*, 774 F.3d at 855; *LaVergne*, 82 F.4th at 436-37. And the Third Circuit's *Shoats* holding that eight years of extreme and "permanent solitary confinement" implicated a liberty interest—in addition to presenting more severe conditions than those alleged here—is also not precedential in this Circuit. 213 F.3d at 144. "Because nonprecedential opinions do not establish any binding law for the circuit, they cannot be the source of clearly established law for qualified immunity analysis." *Marks*, 933 F.3d at 486 (quotation omitted).

As for severity, while Sanders' pleadings are not the model of clarity, several of his allegations and exhibits suggest a degree of human interaction more akin to cases holding that no liberty interest was implicated by the restrictive custody than those reaching the opposite conclusion. *Compare LaVergne*, 82 F.4th at 436-37, *with Wilkerson*, 774 F.3d at 855-56.

Reasonable minds could disagree about whether Sanders' restrictive housing "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin*, 515 U.S. at 484. Even the district court stated that "based on the facts pleaded by [Sanders] and the documents he has attached, his conditions *arguably* meet the test [for implicating due process concerns] at this

stage." ROA.1116 (emphasis added). But an arguable legal conclusion is far from clear and, as the statement suggests, the liberty interest at issue here is tenuous. As long as reasonable minds could disagree, qualified immunity bars the claim. *See Wesby*, 138 S. Ct. at 589-90.

In denying qualified immunity, the district court stated, it "is satisfied that the law was clearly established that an inmate in [Sanders'] position has a liberty interest and must be afforded due process, that is, meaningful review." ROA.1120 (citing *Wilkerson v. Stalder*, No. 00-304-JJB, 2013 WL 6665452 (M.D. La. Dec. 17, 2013), aff'd, 774 F.3d 845 (5th Cir. 2014); *Wilkerson v. Stalder*, 329 F.3d 431, 434 (5th Cir. 2003)). But neither of these *Wilkerson* opinions support a clear, unambiguous liberty interest emerging from the pleadings.

The first *Wilkerson v. Stalder* opinion cited by the court is distinguishable because, among other things, the duration of confinement was four times longer than what Sanders has experienced. *See* 774 F.3d at 855. It does not settle the question of whether Sanders had a liberty interest. The second *Wilkerson v. Stalder* opinion cited is even less applicable because it did not even hold that the inmates had a liberty interest. 329 F.3d at 434 ("Because the inmates' Complaint does not allege whether the inmates' confinement in extended lockdown resulted from their initial classification or from violations of prison rules, we cannot determine whether the

inmates have asserted facts that would give rise to denial of a liberty interest."). To clearly establish the violative nature of the defendant's conduct, the prior decision must hold that a violation of law occurred. *Nerio*, 974 F.3d at 575–76 (5th Cir. 2020); *Salazar*, 37 F.4th at 286.

For all these reasons, even if this Court concludes that Sanders' restrictive housing implicates a liberty interest, Prison Officials are still entitled to qualified immunity because that conclusion is not necessarily compelled by published, binding due process jurisprudence.

### B. The constitutional infirmity of the process Sanders received was not clearly established.

Lastly, even if a liberty interest was clearly established, the deficiency of the process Sanders has received is not. It is not clearly established that the process Sanders has received—as described and demonstrated by his pleadings—falls short of the Fourteenth Amendment's mandates. Besides the two *Wilkerson v. Stalder* cases discussed above, the district court did not identify any precedent with analogous facts that would put Prison Officials on notice that the Security Detention Review hearings they were providing to Sanders every 180 days were insufficient to satisfy his procedural due process rights. *See* ROA.1120. And neither of these opinions actually analyzed the degree of process required in the event of a liberty interest. *Wilkerson*, 774 F.3d at 859; *Wilkerson*, 329 F.3d at 434. These holdings

would not put a reasonable official in Prison Officials' position on notice that their alleged conduct violated Sanders' rights.

The great weight of applicable precedent suggests that Prison Officials did *not* violate procedural due process. The contours of procedural due process in application to the pleadings in this case are not so well-defined that a reasonable officer would know that Prison Officials' alleged conduct was unlawful in the situation they confronted. *See Wesby*, 138 S. Ct. 590.

## CONCLUSION

For these reasons, Prison Officials respectfully ask the Court to reverse the district court order that denied their respective motions to dismiss and to render judgment in their favor.

DATE: JANUARY 16, 2024

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney
General

**JAMES LLOYD**
Deputy Attorney General for Civil
Litigation

**SHANNA E. MOLINARE**
Assistant Attorney General
Chief, Law Enforcement Defense
Division

Respectfully submitted,

*/S/ Benjamin L. Dower*
**BENJAMIN L. DOWER**
Special Litigation Counsel
benjamin.dower@oag.texas.gov

Office of the Attorney General
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2080 / Fax (512) 370-9814

**ATTORNEYS FOR DEFENDANTS-
APPELLANTS KRISTEN GIBSON
BRYAN D. REITSMA, ANGELA N.
DAVIS, TINA S. VITOLO, and MARISSA
BARTHOLET**

## CERTIFICATE OF SERVICE

On January 16, 2024, this brief was served via CM/ECF on all registered

counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1)

any required privacy redactions have been made in compliance with Fifth Circuit

Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document

in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned

with the most recent version of Symantec Endpoint Protection and is free of viruses.

*/s/ Benjamin L. Dower*
**BENJAMIN L. DOWER**
Special Litigation Counsel

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,953 words, excluding the parts of the brief exempted by Rule 32(f), fewer than the 13,000 word limit; and (2) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity Text A) using Microsoft Word (the same program used to calculate the word count).

*/s/ Benjamin L. Dower*
**BENJAMIN L. DOWER**
Special Litigation Counsel